# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|                      |   |                              |
|----------------------|---|------------------------------|
| In re:               | ) |                              |
|                      | ) | Honorable Janet S. Baer      |
| CITE, LLC.,          | ) |                              |
|                      | ) | Case No. 21-13730            |
| Debtor.              | ) |                              |
|                      | ) | Subchapter V-Chapter 11      |
|                      | ) |                              |

## ORDER AUTHORIZING SALE FREE AND CLEAR

This matter coming before the Court for the final hearing on the motion (the "**Sale Motion**") [Docket No. 164] filed by the Trustee (as defined in ¶ 3) for the captioned Bankruptcy Estate (the "**Trustee**") created when the Debtor, CITE, LLC (the "**Debtor**") filed its petition for relief under the United States Bankruptcy Code (11 U.S.C. §§ 101, et. seq., the "**Bankruptcy Code**") seeking, among other things, orders approving bidding procedures, and authorizing and approving the sale of the Debtor's assets free and clear of liens, claims and encumbrances pursuant to a purchase and sale agreement; and the Court having entered an order (the "**Bidding Procedures Order**") [Docket No. 169] on May 18, 2022, authorizing and approving, among other things, bidding procedures in connection with the sale of substantially all of the Debtors' assets, and scheduling an auction; and the Court having reviewed the record in this Case, and having heard statements of counsel; and the Court being fully advised in the premises and having determined that the legal and factual bases set forth in the Sale Motion and those presented to the Court at the Sale Hearing establish just cause for the relief granted herein;

{00224792}

**NOW, THEREFORE, THE COURT HEREBY FINDS, CONCLUDES AND/OR ORDERS THAT:**

(1) This Court has jurisdiction and authority to enter this Order and grant the relief set forth herein pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (N) and (0) and §§ 363(b) and (f) of the Bankruptcy Code. The venue of this Chapter 11 Case (the "**Case**") in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are §§ 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

(2) The Court intends for this Order to be a final and appealable order within the meaning of 28 U.S.C. § 158(a).

(3) On December 3, 2021 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the Case. The Debtor designated itself as a small business debtor eligible for relief under "Subchapter V" of Chapter 11. The Office of the United States Trustee appointed Robert Handler, as the Subchapter V Trustee for the Case (the "**Trustee**").

(4) On March 25, 2022, the Court entered an order that removed CITE, LLC as debtor-in-possession under 11 U.S.C. § 1185 and provided that under 11 U.S.C. § 1183(b)(5), the Debtor's duties under 11 U.S.C. §§ 704(a)(8) and 1106(a)(1), (2), and (6) will be performed by Robert Handler, the Subchapter V Trustee.

(5) The Debtor's primary assets consist of Real Property commonly known as 505 N. Lake Shore Drive, Units 207, 209, 209-A, 224, and 7000, Chicago, IL 60611. The Debtor's assets also consist of the tangible personal property used and useful in the operation of the restaurant known as Cité Restaurant located on the 70th floor of Lake Point Tower (the foregoing parcels of real estate are collectively referred to as the "**Real Estate**" and the tangible property used and useful in the operation of CITE LLC, other than the Real Estate, is known as the "**Personal Property**" and collectively the Real Estate and the Personal Property are known as the "**Sale Property**").[1]

(6) On May 18, 2022, the Court entered a Sale Procedures Order authorizing the Trustee to implement a process for selling the Sale Property. [Docket No. 169]

(7) In accordance with the Sale Procedure Order, notice of the Auction was provided to all parties in interest. As evidenced by the certificate of service filed on the Docket on June 2, 2022 [Docket No. 184], proper, timely, adequate and sufficient notice of the Sale Motion, the relief granted herein and the Sale Hearing has been provided in accordance with §§ 102 and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9006, 9007, 9008 and 9014, and the Sale Procedures

---

[1] For the avoidance of doubt, the Sale Property consists of the assets set forth in Section 2.1 of the PSA appended hereto as Exhibit 1. The Property does not include any causes of action available to the Bankruptcy Estate pursuant to any of the provisions under §§ 541 through 553 of the Bankruptcy Code.

Order. Such notice was good and sufficient, and appropriate under the circumstances. No other or further notice of the Sale Motion, the relief granted herein, the Sale Hearing or the entry of this Order is necessary or shall be required.

(8) The Trustee and his professionals, agents and other representatives have complied in all respects with the Sale Motion. Under the circumstances, the Trustee and his professionals, agents and other representatives have adequately and appropriately marketed the Sale Property. The Sale was duly noticed and conducted in a diligent, non-collusive, fair and good faith manner, and the bidding procedures afforded a full, fair and reasonable opportunity for any person or entity to qualify as a bidder, participate in the bidding process and make a higher or otherwise better offer to purchase the Sale Property.

(9) The Trustee and his professionals, agents and other representatives (a) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Sale Property, and (b) faithfully executed their duties in considering all offers and bids throughout the bidding process and in determining that Lakeshore Commercial Properties LLC ("**LCP**" or "**Purchaser**") is the successful bidder for the Sale Property on the terms and conditions set forth in the Purchase and Sale Agreement (the "**PSA**") attached hereto as Exhibit 1.

(10) All objections to the relief granted herein, whether filed, stated on the record in Court or otherwise, are OVERRULED on the merits and with prejudice to

the extent they have not been withdrawn, waived or resolved. Al1 objections to the relief granted herein that were not timely filed are forever barred.

(11) Republic Bank, in reliance on the Trustee agreeing to sell the Sale Property to Purchaser pursuant to this Order in its current form and substance, elected not to exercise its rights under § 363(k) of the Bankruptcy Code to credit bid. At the Closing of the Sale, the Trustee is authorized to disburse sale proceeds of up to $3,400,000 to Republic Bank, in partial satisfaction of Republic Bank's secured claim and without prejudice to further distributions to Republic Bank on account of any of its claims. Pursuant to the agreement of Republic Bank, the Court directs that at the Closing (a) $100,000 of the proceeds payable to Republic Bank from the Sale shall be transferred to the Trustee for the Trustee's costs and expenses of administering the bankruptcy estate and (b) $215,500 of the sale proceeds shall be payable to Hilco Real Estate in satisfaction of any commissions due and payable to any real estate brokers, including Hilco Real Estate, as broker for the Trustee and any real estate broker for Purchaser, and (c) $300,000 shall be deposited or retained in an escrow account pending the outcome of a dispute between the Trustee and the Lake Point Tower Condominium Association (the "**Association**") related to the roof for CITE.  Hilco shall promptly satisfy and pay any brokerage commission owed to the broker for the Purchaser.

(12) The offer of Purchaser, upon the terms and conditions set forth in the PSA, including the form and the total consideration to be realized by the Estate

pursuant to the PSA: (a) is the highest and best offer received by the Trustee for the Sale Property after extensive marketing, including through the Bidding Procedures; (b) is fair and reasonable; (c) is in the best interest of the Bankruptcy Estate, the Debtor, and its creditors; and (d) constitutes full and adequate consideration and reasonably equivalent value for the Sale Property.

(13) Purchaser is the successful bidder for the Sale Property in accordance with the Bidding Procedures Order.  The Trustee's determination that the Sale set forth in the PSA constitutes the highest and best offer for the Sale Property is a valid and sound exercise of the Trustee's business judgment. The Trustee has determined that the sale of the Sale Property under the terms set forth in the PSA represents the best opportunity for the estate to realize the greatest value for the Sale Property and will provide a greater recovery for creditors and interest holders than would be provided by any other practical or available alternative.

(14) The Trustee has demonstrated a sufficient and sound business purpose and basis to enter into the PSA, sell the Sale Property on the terms outlined therein under § 363(b) and (f) of the Bankruptcy Code, and all such actions are appropriate exercises of the Trustee's business judgment and in the best interests of the Bankruptcy Estate. the Debtor, creditors, and interest holders. The PSA and all of the terms and conditions thereof, are hereby approved.

(15) The Sale of the Sale Property to Purchaser as set forth in the PSA is approved free and clear of any and all liens, claims, encumbrances and interests

pursuant to §§ 105 and 363(b) and (f) of the Bankruptcy Code, and the Trustee and Purchaser and their respective affiliates, officers, directors, employees, professionals, agents and other representatives are authorized to immediately take any and all such actions as are necessary or appropriate to consummate and implement the PSA.

(16) Pursuant to §§ 105(a) and 363(b) of the Bankruptcy Code, the Trustee is authorized to transfer the Sale Property to the Purchaser at Closing (as defined in the PSA). The Sale Property shall be transferred to Purchaser "as is, where is" to the extent provided in the PSA upon and as of the Closing. The purchase and sale of the Sale Property and the related transfer constitutes a legal, valid, binding and effective transfer of the Sale Property and shall be free and clear of all interests, liens, claims and encumbrances of any kind or nature whatsoever (collectively, "**Liens and Claims**") because one or more of the standards set forth §§ 363(f)(l)-(f)(5) of the Bankruptcy Code have been satisfied. Accordingly, all persons or entities having Liens and Claims against or in any of the Sale Property shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Liens and Claims against the Sale Property, Purchaser or any of Purchaser's assets, property, successors or assigns. Upon the entry of this Order, any and all Liens and Claims as against the Sale Property are deemed waived, released, and discharged with such Liens and Claims being transferred to the proceeds of the Sale Property.

(17) The Trustee is authorized to execute and deliver the PSA, together with all additional agreements, instruments and documents that may be reasonably necessary or desirable to implement the PSA and effectuate the provisions of this Order and the transactions approved hereby, all without further order of the Court. The PSA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court, provided that such modification, amendment or supplement does not have a material adverse effect on the Bankruptcy Estate.

(18) Purchaser and its professionals, agents and other representatives have complied in all respects with the bidding procedures and all other applicable orders of this Court in negotiating and entering into the PSA, and the Sale and the PSA comply with the bidding procedures and all other applicable orders of this Court.

(19) Neither Purchaser nor any of its affiliates, members, officers, directors, shareholders or any of their respective successors and assigns is an "insider" or "affiliate" of the Debtor, as those terms are defined in §§ 101(31) and 101(2) of the Bankruptcy Code, respectively. No common identity of directors or controlling shareholders exists between the Debtor and Purchaser.

(20) The Sale contemplated by the PSA is undertaken by Purchaser without collusion and in "good faith," as that term is defined in § 363(m) of the Bankruptcy Code and the Purchaser is a "good faith" purchaser within the meaning of § 363(m)

of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorizations provided herein to consummate and close the Sale shall not affect the validity of the Sale unless such authorizations, consummation and Closing of such Sale is duly stayed pending such appeal.

(21) Purchaser is not a mere continuation of the Debtor. In particular, for the avoidance of doubt, the term "**Liens and Claims**" as used herein includes, without limitation, any mortgage, lien (as such term is defined in 11 U.S.C. § 101(37), including any mechanic's, materialman's, broker's, statutory, cash collateral or carve out lien or any other consensual or non-consensual lien), security interest, lawsuit, charge, hypothecation, deed of trust, pledge, right of use, first offer or refusal, servitude, restrictive covenant, lease, sublease, covenant, right of way, option, restriction (including any restriction on transfer or on the use, voting, receipt of income or other rights or exercise of any attributes of ownership), conditional sale or other title retention agreements, interest, encumbrance of any kind, debt, liability, obligation or claim (as that term is defined in 11 U.S.C. § 105(5)), and including any claim against either Purchaser and/or any of the assets or properties of Purchaser (including the Sale Property) based on a theory of successor liability, alter-ego or any similar theory of liability, and all costs and expenses relating thereto.

(22) Except as specifically provided by the PSA or this Order, all entities holding Liens and Claims or interests in or on any portion of the Sale Property

arising under or out of, in connection with or in any way relating to the Debtors, the

Sale Property, the operation of the Debtor's business prior to the Closing Date or

the transfer of the Sale Property to Purchaser, are forever barred, estopped and

permanently enjoined from asserting against Purchaser or its successors or assigns,

their property or the Sale Property, any such Liens and Claims on the Sale

Property.

(23) On or before the Closing Date, each creditor is authorized and directed to

execute such documents and take all other actions as may be necessary to release

Liens and Claims on the Sale Property, if any, as provided for herein, as such Liens

and Claims may have been recorded or may otherwise exist. Any creditor's failure

and/or refusal to release such Liens and Claims on the Sale Property shall not have

any impact on the enforceability of any provision of this Order, including, but not

limited to, any provision providing that the Sale shall be free and clear of all

interests, liens, claims and encumbrances of any kind or nature whatsoever

(24) Upon consummation and Closing of the Sale, the Trustee and Purchaser

are authorized to file termination statements or lien terminations in the name of or

on behalf of any lien creditor in any required jurisdiction to remove any record,

notice filing, or financing statement recorded to attach, perfect or otherwise notice

any Lien and Claim that is extinguished or otherwise released pursuant to this

Order under § 363 and the related provisions of the Bankruptcy Code.

Notwithstanding the preceding, the provisions of this Order authorizing the

transfer of the Sale Property free and clear of all Liens and Claims shall be self-

executing, and the Trustee, Purchaser and creditors shall not be required to execute

or file releases, termination statements, assignments, consents or other instruments

in order for the provisions of this Order to be effectuated, consummated and/or

implemented.

(25) All persons and entities that are in actual or constructive possession of,

or that have the ability to control the surrender or delivery of, some or all of the

Sale Property are directed to surrender or deliver possession of the Sale Property to

Purchaser at the Closing or to cause any applicable third party to surrender or

deliver possession of the Sale Property to Purchaser at Closing, at no cost to

Purchaser.

(26) Effective upon Closing, all entities are forever prohibited and

permanently enjoined from commencing or continuing in any manner any action or

other proceeding, whether in law or equity, in any judicial, administrative, arbitral

or other proceeding of any sort whatsoever, against Purchaser, its successors and

assigns, or the Sale Property, with respect to any Liens and Claims arising under,

out of, in connection with or in any way relating to the Debtor or the Sale Property

prior to the Closing.

(27) Nothing contained in any plan of reorganization or liquidation, or order

of any type or kind entered in (a) the Case, (b) any subsequent chapter 7 case into

which this Case may be converted, or (c) any related proceeding subsequent to entry

of this Order, shall conflict with or derogate from the provisions of the PSA or the terms of this Order.

(28) Time is of the essence in consummating the Sale. To maximize the value of the Sale Property and minimize the costs incurred by the Bankruptcy Estate, it is essential that the Sale occur promptly, and within the time constraints set forth in the PSA. Pursuant to Bankruptcy Rules 9014 and 6004(h), this Order shall be effective immediately upon entry and Trustee and Purchaser are authorized to close the Sale immediately upon entry of this Order.

(29) The failure specifically to include any particular provision of the PSA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the PSA be authorized and approved in its entirety.

(30) To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this Case, the terms of this Order shall govern.

(31) To the extent there are any inconsistencies between the terms of this Order and the PSA (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

(32) [A copy of the form of Agreement referenced in Section 7.1(g) of the PSA will be referenced and attached]

(33) The Court shall retain jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Order and the PSA, all amendments thereto and any waivers and consents thereunder, and each of the agreements executed in connection therewith to which the Trustee or the Debtor are a party or which has been assigned to Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale or the Sale Property.

(34) The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052, made applicable to this proceeding under Bankruptcy Rule 9014. To the extent that any of the findings of fact herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

August __, 2022                                ENTERED:

                                               _____
                                               Hon. Janet S. Baer
                                               United States Bankruptcy Judge

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is dated as of August __, 2022, the "Effective Date"), by and between Robert Handler, not in any capacity, including in any individual capacity, other than in the capacity as the Subchapter V Trustee for the bankruptcy estate of Cite, LLC (the estate created for the assets of Cite, LLC is referred to as the "Bankruptcy Estate"), the debtor in bankruptcy case No. 21-13730 (hereafter referred to as the "Seller") and Lakeshore Commercial Properties LLC (hereafter referred to as the "Purchaser"), (collectively, Seller and Purchaser may be referred to in this Agreement as the "Parties" and individually, "Party").

## RECITALS:

WHEREAS, On December 3, 2021 (the "Petition Date"), Cite, LLC, an Illinois limited liability company (referred to in this Agreement as the "Debtor" or "Cite"), filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 case (the "Chapter 11 Case").

WHEREAS, The Office of the United States Trustee originally appointed Robert Handler, as the Subchapter V Trustee for the Chapter 11 Case.

WHEREAS, On March 25, 2022, the Bankruptcy Court entered an order removing the Debtor as debtor-in-possession in the Chapter 11 Case pursuant to 11 U.S.C. § 1185, which order further provided that pursuant to 11 U.S.C. § 1183(b)(5), the Debtor's duties under 11 U.S.C. §§ 704(a)(8) and 1106(a)(1), (2), and (6) shall be performed by Robert Handler, the Subchapter V Trustee (the "Trustee Order").

WHEREAS, Cite ("Record Owner ") is the owner of the property commonly known as 505 N. Lake Shore Drive, Units 207, 209, 209A, 224 and 70000 and more particularly described on **Exhibit A**.

WHEREAS, Seller is in possession of the Property (defined below) pursuant to the Trustee Order.

WHEREAS, On May 18, 2022, the Bankruptcy Court entered an order (the "Sale Procedure Order") authorizing the Subchapter V Trustee to implement procedures for marketing and selling the Property, to solicit bids for the Property, to conduct an auction for the Property among the Qualified Bidders, if warranted, to designate a bid as the Successful Bid and to seek an order from the Bankruptcy Court authorizing the sale of the Property to the Successful Bidder.

{00221955 2}                                    1

WHEREAS, Seller conducted an auction of the Property in accordance with the Sale Procedure Order and Purchaser was designated either as the Winner Bidder[1] or the Backup Winning Bidder.

WHEREAS, Seller intends to seek from the Bankruptcy Court an order authorizing Seller to consummate the transactions set forth in this Agreement pursuant to Sections 363(b) and (f) of the Bankruptcy Code (the "Sale Authorization Order").

WHEREAS, Seller desires to sell, and Purchaser desires to purchase, the Property, as defined below, in exchange for cash, pursuant to, and subject to, the terms and conditions set forth herein, including the entry of an order (the "Sale Authorization Order") by the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court") authorizing the Seller to sell the Property in accordance with §§ 363(b) and 363(f) of title 11, United States Code (11 U.S.C. §§ 101, *et seq*, the "Bankruptcy Code");

NOW, THEREFORE, in consideration of the sale of the Property and the representations, warranties, covenants, conditions and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

BASIC INFORMATION:

**B-1**.   **Basic Terms**.   The following defined terms shall have the meanings set forth below:

| | |
|---|---|
| Seller: | Robert Handler, not in any capacity, including any individual capacity, other than in the capacity as the Subchapter V Trustee for the Bankruptcy Estate of Cite, LLC |
| Purchaser: | Lakeshore Commercial Properties LLC |

---

[1] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Sale Procedures Order or the Subchapter V Trustee's Motion for Order Setting Procedures for the Marketing and Sale of Debtor's Assets.

| | |
|---|---|
| Purchase Price: | $ 4,150,000.00 , allocated as: (i) $2,040,000 for the Real Property (as that term is defined below); and (ii) $2,110,000.00 for the Personal Property (as that term is defined below). |
| Deposit | Cash Deposit: $100,000<br>Additional Deposit: 10% of the Winning Bid, less the amount of the Cash Deposit |
| Title Company: | Chicago Title Insurance Company<br>10 S LaSalle, Suite 2910<br>Chicago, Illinois  60602<br>Attention:    Becky Voss<br>Telephone:   (312) 223-2836<br>E-Mail:       vossb@ctt.com |
| Escrow Agent: | Same as Title Company _____<br><br>_____<br><br>_____<br>Attention:<br>Telephone:   _____<br>E-Mail:       _____ |
| Broker: | Hilco Real Estate. |
| Effective Date: | August 1, 2022 |
| **Closing Date** | The date ten (10) days after the entry of the Sale Authorization Order |

      **B-2**.    **Notice Addresses**.    The following are notice addresses for purposes of <u>Section 10.3</u> of this Agreement:

          Purchaser:          Lakeshore Commercial Properties LLC<br>                                   45 Baybrook Ln

Oak Brook, Illinois 60523
Attention:  Al Lotfi
Telephone: 630.805.4022
E-Mail: allotfi1@yahoo.com


Copy to:          Brian P. Welch
                  Burke, Warren, MacKay & Serritella, P.C.
                  330 N. Wabash, #2100
                  Chicago, IL 60611
                  312.840.7117
                  bwelch@burkelaw.com


Seller:           Robert Handler, not in any capacity, including any
                  individual capacity, other than in the capacity as the
                  Subchapter V Trustee for the Bankruptcy Estate of
                  Cite, LLC
                  c/o Commercial Recovery Associates, LLC
                  205 W Wacker Drive, Suite 918
                  Chicago, IL 60606
                  O: (312) 845-5001
                  C: (312) 543-3427
                  E-Mail:  rhandler@com-rec.com

Copy to:          William J. Factor
                  FactorLaw
                  105 W Madison, Suite 1500
                  Chicago, IL 60602
                  Telephone:   312.878.6146
                  E-Mail:  wfactor@wfactorlaw.com


**B-3**.    **Closing Costs**.  Closing costs shall be allocated and paid as follows:

| Cost | Responsible Party |
|---|---|
| Title Commitment required to be delivered pursuant to Section 4.1(a) | Seller |
| Premium for standard form Title Policy with extended coverage endorsement required to be delivered pursuant to Section 7.1(d) | Purchaser |

| | |
|---|---|
| Premium for any upgrade of Title Policy for additional coverage and any endorsements desired by Purchaser, any inspection fee charged by the Title Company, tax certificates, municipal and utility lien certificates, and any other Title Company charges | Purchaser |
| Costs for UCC Searches | Purchaser |
| Recording fees and taxes | Purchaser |
| Any state and county deed taxes, documentary stamps or transfer taxes | Seller or NA |
| Any municipal deed taxes, documentary stamps or transfer taxes, and any mortgage taxes | Per ordinance |
| Any escrow fee charged by Escrow Agent for holding the Deposit or conducting the Closing | Purchaser ½ Seller ½ |
| Real Estate Sales Commission to Hilco Real Estate ("Broker") | Seller |
| All other closing costs, expenses, charges and fees | Purchaser |

## ARTICLE 2: PURCHASE AND SALE

Section 2.1   Purchase and Sale.  Subject to the terms and conditions of this Agreement, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, subject to that certain condominium declaration (the "Declaration of Condominium Association") and bylaws of the condominium  ("Bylaws", collectively with the Declaration of Condominium Association, the "Condominium Documents") the following:

(a)      the land described on **Exhibit A**, with all rights, privileges and easements appurtenant thereto and an  undivided interest (in a percentage to be determined at a later date by the written agreement of the Purchaser and Seller) in the Common Elements (as such term is defined in the Declaration of Condominium Association) with all rights, privileges and easements appurtenant thereto (the "Real Property");

(b)      Seller's right, title, and interest in and to all furniture, fixtures, equipment, machinery, and other tangible personal property located at the Real Property (collectively, the "Personal Property", and together with the Real Property, the "Property"), including all inventories of food and beverage in opened and unopened containers and all in-use or stock of linens, china, glassware, silver, uniforms, towels, paper goods, stationery, soaps, cleaning supplies and the like with

respect to the restaurant on hand as of the Closing Date and  any warranties and guaranties relating to the Personal Property.

(c)     Notwithstanding anything contained in this <u>Section 2.1</u> to the contrary, Property specifically does not include, and none of the following shall be transferred to Purchaser (the "Excluded Property"): (a) Seller's cash and cash equivalents, whether on hand, in bank accounts or elsewhere; (b) any accounts receivable (c) any credit card merchant numbers of Seller, (d) any insurance policies related to the Property including, without limitation, general liability, operational liability, business interruption, fire and casualty policies, and all proceeds and claims thereunder, (e) any refunds (including, without limitation, refunds of real estate taxes or insurance premiums) attributable to the period prior to the Closing Date, (f) any intangible property, provided, however, that Purchaser and Seller expressly agree that Purchaser shall be allowed to use  the name Cite, (g) any and all causes of action, choses in action, claims or any rights against third parties, including any under the Bankruptcy Code; and (h) any prepaid expenses or deposits related to any of the Excluded Property.

(d)     Purchaser shall acquire the Property pursuant to a sale authorized by § 363(b) and (f) of the Bankruptcy Code. Such sale shall be free and clear only of the rights and interests that § 363(f) of the Bankruptcy Code addresses.

(e)     Nothing in this Agreement shall be binding upon Seller unless and until the Bankruptcy Court enters the Sale Authorization Order authorizing the Seller to enter into this Agreement and be bound by the terms hereof.

(f)     Purchaser acknowledges and agrees that the sale of the Property may be subject to an auction or competitive bidding process and Purchaser's rights to acquire the Property under this Agreement, as well as Seller's obligations to sell the Property to Purchaser, are in all respects subject to a determination by Seller, after considering all other offers for the Property and options for maximizing its value, that Purchaser has submitted the Winning Bid and is the Winning Bidder and the sale of the Property to Purchaser is in the best interests of stakeholders.

Section 2.2   Condition of the Property; No Representations.

(a)     Purchaser acknowledges and agrees that: (i) Purchaser has been given a reasonable opportunity to inspect and investigate the Property and all aspects relating thereto, including, without limitation, all of the physical, environmental and operational aspects of, or conditions on, the Property, either independently or through agents and experts of Purchaser's choosing; (ii) Purchaser will acquire the Property based upon Purchaser's own investigation and inspection

of the Property; (iii) Purchaser has been given a reasonable opportunity to review and inspect the documents and other materials delivered to Purchaser or made available to Purchaser as contained in the data room of the Broker (the "Property Materials") and (iv) Purchaser shall have no right or opportunity to request any additional documents related to the Property.  Purchaser acknowledges and agrees that (i) Seller may have been provided with information, some of which is related to the Property and some which may not be in the possession and control of Seller, (ii) Seller has not necessarily reviewed such information and (iii) Seller may be unaware of information in its possession that relates to the Property. Seller makes no representation or warranty with respect to the Property Materials or the accuracy or completeness of such documents. Purchaser acknowledges and agrees that any inaccuracy, incompleteness or relevancy in the Property Materials shall not constitute a breach of this Agreement by Seller and shall not constitute grounds by which Purchaser can terminate this Agreement.

(b)     The roof and masonry components of the condominium building where the Real Property is located have suffered damage and are likely to continue to suffer damage unless such roof and masonry components are replaced. There is a dispute as to whether the cost of the repairs to and/or replacement of the roof and masonry components shall be borne by the Lake Point Tower Condominium Association (the "Association") or the owner of the Real Property. Seller and Purchaser agree that at closing, $300,000.00 (the "Escrowed Funds") of the Purchase Price will be placed into an escrow account, to be administered by an escrow agent selected by the agreement of the Seller and the Purchaser pursuant to the Escrow Agreement included on Exhibit __ hereto, to be held until such time as any dispute as to the identity of the responsible party for any repairs to and/or replacement of the roof and masonry is determined by final adjudication or otherwise. To the extent that it is determined that the owner of the Real Property shall be responsible for repairs to and/or replacement of the roof and masonry components, the Escrowed Funds shall be released, upon the mutual direction to the escrowee of the Seller and the Purchaser, to the Purchaser. To the extent that it is determined that the Association shall be responsible for repairs to and/or replacement of the roof and masonry components, the Escrowed Funds shall be released, upon the mutual direction to the escrowee of the Seller and the Purchaser, to the Seller. In the event that the Purchaser and the Association share in the costs of any repairs to and/or replacement of the roof and masonry, the Purchaser shall be entitled to a dollar-for-dollar credit from the Escrowed Funds for its share of such costs. For the avoidance of doubt, and by way of illustration only, Seller and Purchaser agree that: (i) if the Purchaser's responsibility for repairs to and/or replacement of the roof and masonry components exceeds $300,000, the Escrowed Funds shall be released, upon the mutual direction to the escrowee of the Seller and the Purchaser, to the Purchaser; (ii) if the Purchaser's responsibility for repairs to and/or replacement of the roof and masonry components is $0.00, the Escrowed

Funds shall be released, upon the mutual direction to the escrowee of the Seller and the Purchaser, to the Seller; and (iii) if the Purchaser's responsibility for repairs to and/or replacement of the roof and masonry components is between $1.00 and $300,000, the Escrowed Funds shall be released, upon the mutual direction to the escrowee of the Seller and the Purchaser, to the Purchaser in an amount sufficient to cover the Purchaser's costs, with the remainder of any Escrowed Funds to be released to the Seller.

(c)    PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT EXCEPT AS EXPRESSLY SET FORTH HEREIN, (i) SELLER IS CONVEYING THE PROPERTY TO PURCHASER "AS IS, WHERE IS AND WITH ALL FAULTS" AND (ii) NEITHER PURCHASER NOR ANY OTHER PERSON IS RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, FROM SELLER OR ANY DIRECT OR INDIRECT PARTNER, OFFICER, DIRECTOR, TRUSTEE, MEMBER, EMPLOYEE, AFFILIATE, ATTORNEY, AGENT OR BROKER OF SELLER OR ANY OF ITS AFFILIATES, AS TO ANY MATTER CONCERNING THE PROPERTY OR SELLER OR SET FORTH, CONTAINED OR ADDRESSED IN ANY DUE DILIGENCE MATERIALS (INCLUDING, WITHOUT LIMITATION, THE COMPLETENESS THEREOF), INCLUDING, WITHOUT LIMITATION: (ii) the quality, nature, habitability, merchantability, use, operation, value, marketability, adequacy or physical condition of the Property or any aspect or portion thereof, including, without limitation, structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities, electrical, mechanical, HVAC, plumbing, sewage, water and utility systems, facilities and appliances, soils, geology and groundwater, (iii) the dimensions or lot size of the Property or the square footage of any of the improvements thereon or of any tenant space therein, (iv) the development or income potential, or rights of or relating to, the Property, or the fitness, suitability, value or adequacy of the Property for any particular purpose, (v) the zoning or other legal status of the Property, (vi) the compliance of the Property or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any Governmental Authority or of any other Person or entity (including, without limitation, the Americans with Disabilities Act of 1990, as amended), (vii) the ability of Purchaser or any of its affiliates to obtain any necessary governmental approvals, licenses or permits for the use or development of the Property, (viii) the presence, absence, condition or compliance of any hazardous or toxic materials or substances on, in, under, above or about the Property or any adjoining or neighboring property, (ixi) the quality of any labor and materials used in any improvements at the Property, or (x) the economics of, or the income and expenses, revenue or expense projections or other financial matters, relating to the operation of, the Property. Without limiting the generality of the foregoing, Purchaser expressly acknowledges and agrees that, except as set

forth herein, it is not relying on any representation or warranty of the Debtor or Seller or any of either of their affiliates or any direct or indirect partner, member, director, trustee, officer, employee, affiliate, attorney, agent or broker of any of them, whether implied, presumed or expressly provided, arising by virtue of any statute, regulation or common law right or remedy in favor of any of them. Seller is not under any duty to make any inquiry regarding any matter that may or may not be known to Seller. For the purposes of this Agreement, "Person" means any individual, corporation, partnership, association, trust, limited liability company, or other entity or organization.

(d)     The Property Materials are delivered without any representation or warranty as to the completeness or accuracy of the data or information.  Seller has neither verified the accuracy of any statements or other information therein contained, the method used to compile the information or the qualifications of the persons who prepared the information. The Property Materials are provided on an AS IS WHERE IS BASIS.

(e)     If this Agreement is terminated for any reason or if Purchaser is not the Winning Bidder, Purchaser shall promptly deliver to Seller (i) all copies of all of the property documents and materials, and (ii) any other materials delivered or made available to Purchaser in respect of Seller, any of its affiliates, or the Property. Further, if this Agreement is terminated or Purchaser is not the Winning Bidder, Purchaser shall promptly destroy, and provide to Seller written certification of such destruction, all copies of any analyses, compilations, studies or other documents or records prepared by Purchaser, its affiliates, representatives, employees, and agents that contain, reflect or are derived from information in the property documents or other information provided for in this Agreement or otherwise related to Seller, any of its affiliates or the Property.   Without limiting the foregoing, if this Agreement is terminated for any reason or if Purchaser is ot the Winning Bidder, Purchaser shall assign and deliver to Seller, and Purchaser does hereby assign without the need for any further act or instrument, all reports, plans, studies, documents, written information and the like which has been generated by Purchaser, Purchaser's Representatives, in house or by Purchaser's third party consultants; provided, however, Seller shall not assume, and Purchaser shall remain obligated for, any unperformed obligations or unpaid costs and expenses arising under or in connection with any such reports, plans, studies, documents and other written information.

(f)     This Section 2.2 shall survive Closing indefinitely.

# ARTICLE 3.
# PURCHASE PRICE

Section 3.1    Purchase Price.  The Purchase Price (such amount, as may be adjusted as provided for herein), shall be payable in cash by wire transfer of immediately available funds to a bank account (the "Escrow Account") designated by Title Company and, in its capacity as Escrow Agent. The total Purchase Price of $4,150,000.00 shall be allocated as follows: (i) $2,040,000 for the Real Property; and (ii) $2,110,000.00 for the Personal Property.

Section 3.2    Deposits.

(a)    Payment of Deposits.

(i)    Purchaser has delivered to Seller the Cash Deposit.

(ii)    Not later than 5:00 p.m. (prevailing Central time) on the next Business Day after that day on which Purchaser is designated the Winning Bidder (the "Additional Deposit Deadline"), Purchaser shall deliver to Escrow Agent an amount equal to 10% of the Winning Bid, less the amount of the Cash Deposit (the "Additional Deposit").  The Additional Deposit shall be paid in cash by wire transfer of immediately available funds to the Escrow Agent by the Additional Deposit Deadline.  If Purchaser fails to deliver the Additional Deposit by the Additional Deposit Deadline, then (a) Seller shall have the right, but not the obligation, to sell the Property to the Backup Winning Bidder and Purchaser shall not have any further rights hereunder, (c) Seller shall retain the Cash Deposit and shall have the right, but not the obligation, to apply such finds in any manner Seller deems appropriate, and (d) Seller shall have all rights and remedies available at law and in equity against Purchaser for a breach of this Agreement and a breach of Purchaser's obligations to consummate the transaction this Agreement contemplates and such rights and remedies shall be available to Seller irrespective of the entry of the Sale Authorization Order.  As used in this Agreement, the term "Business Day" means any day of the year, other than Sunday, Saturday or any other day that the Federal Reserve Bank of New York recognizes as a federal holiday.

(b)    Escrow Agent and Deposit.  The Additional Deposit shall be held by Escrow Agent pursuant to a strict joint order escrow by and among Seller, Purchaser and Escrow Agent. At Closing, Escrow Agent shall deliver the Additional Deposit to Seller, less the Cash Deposit, for application toward the Purchase Price. Purchaser hereby acknowledges and agrees that, except as set forth herein, the Deposit and the Additional Deposit shall be non-refundable to Purchaser in any and all events and shall be deemed fully earned by Seller upon delivery thereof to Escrow Agent in consideration for Seller's agreement to enter into this Agreement.

Section 3.3    Apportionments and other Ajustments

(a)    <u>General</u>.  All items of revenue and expense with respect to the
Property, and applicable to the period of time before and after Closing Date, shall be
allocated between Seller and Purchaser as provided herein.  Pursuant to such
allocation, Seller shall be entitled to all revenue and shall be responsible for all
expenses for the period of time up to 11:59 P.M. (Central Time) on the day
immediately preceding the Closing Date (the "<u>Adjustment Point</u>"), and Purchaser
shall be entitled to all revenue and shall be responsible for all expenses for the
period of time after the Adjustment Point.  Such adjustments shall be shown on the
Closing Statement with such supporting documentation as the Parties hereto may
reasonably require being attached as exhibits to the closing statements and shall
increase or decrease (as the case may be) the cash amount payable by Purchaser.
All prorations shall be made on the basis of the actual number of days in the year
and month in which the Closing occurs or in the period of computation.  All
prorations shall be final. Without limiting the generality of the foregoing, the
following items shall be allocated and prorated as of the Adjustment Point:

(b)    Real Estate Taxes, Personal Property Taxes and Assessments.
Real estate taxes, personal property taxes, and assessments (and refunds thereof)
on the basis of the fiscal year or fiscal years for which assessed. If the Closing shall
occur before a new real property tax rate, personal property tax rate, or assessed
valuation is fixed, the apportionment of such tax at Closing shall be upon the basis
of the most recent ascertainable real estate taxes. If the real property taxes relating
to any period prior to the Adjustment Point are reduced at any time, including after
the Closing, Purchaser shall pay to Seller no later than 10 days after such
reduction, the amount of such reduction related to any period prior to the
Adjustment Point and also shall pay a pro-rated amount of any fees or expenses
owed or incurred in connection with any such reduction, with such pro-ration
determined by the benefits Purchaser obtains as a result of the reduction.  In
addition, if any real property assessment or personal property assessment affects
the Property as of the Closing Date and such real property assessment or personal
property assessment is payable in annual or other installments (whether at the
election of Seller or otherwise), only the installment relating to, or payable over, the
fiscal period of the assessing authority, part of which is included within the period
prior to the Closing Date and part of which is included in the period after the
Closing Date, shall be apportioned between Seller and Purchaser as of the
Adjustment Point; however, such assessments which are not payable in
installments shall be paid by Seller at Closing where the work has been completed,
and shall be assumed by Purchaser at Closing and paid by Purchaser where the
work has been authorized or started, but not completed.

(c)    Utilities.  As of the Closing Date, Seller shall terminate all accounts for all utilities and Purchaser shall open accounts for such utilities. With respect to such utilities which accounts cannot be terminated and new accounts created, such utilities shall be allocated based upon meter readings made as contemporaneously as possible to the Adjustment Point (or, if not possible, on the basis of the most recent previous bills and readings).

(d)    Assessments. Assessments, common charges or fees payable to any condominium association pursuant to the Condominium Documents on the basis of the respective periods for which such charges are assessed or imposed.

(e)    Other Items. Any other operating expenses and any other items relating to the Property which are ordinarily adjusted between sellers and purchasers of commercial real estate comparable to the Property.

Section 3.4   Employees.  Seller shall terminate all employees ("Employees") as of or before Closing and shall be responsible and shall cause the payment of on or before the Closing Date any liability to or respecting the Employees by Seller having accrued through the Adjustment Point, including liability for payment of all Employees' wages, bonuses, commissions, and other forms of compensation or benefits earned by and due and owing to Employees as of the Adjustment Point, together with F.I.C.A., unemployment and other taxes and benefits due from any employer of such Employees (collectively, the "Employee Compensation")..

## ARTICLE 4.
## TITLE AND PROPERTY RELATED MATTERS

Section 4.1   Delivery of Title Commitment.   As part of the Property, Seller has provided: (i) a current commitment for title insurance or preliminary title report (the "Title Commitment") issued by the Title Company, in the amount of the Purchase Price and on an ALTA 2021 Standard Form commitment and (ii) copies of all documents of record referred to in the Title Commitment as exceptions to title to the Property.

Section 4.2   Title Insurance Policy.  Purchaser may, at its own expense, obtain an owner's title insurance policy for the Property, but Seller shall have no obligation to obtain any commitment for any such policy and shall not be responsible for any expenses or costs for such policy.   Seller shall convey the Property free and clear of all monetary liens, charges or encumbrances.  Seller shall have no obligation to remove any non-monetary encumbrances and other restrictions, including any easements.

Section 4.3   Condemnation.  In the event that any Governmental Authority commences  condemnation proceedings, taking by power of eminent domain or any similar action (such action, a "Condemnation") with respect to the Property or any

Material Portion thereof, Purchaser may, at its option, by written notice to Seller given prior to the earlier of (i) the Closing Date, and (ii) five (5) days after Seller notifies Purchaser of such action, either: (x) terminate this Agreement, the Deposit shall be returned to Purchaser and the Parties hereto shall have no further rights or obligations, other than those that by their terms survive the termination of this Agreement, or (y) proceed under this Agreement, in which event Seller shall, at the Closing, assign to Purchaser its entire right, title and interest in and to any condemnation award, or credit the Purchase Price in the amount of any award received by Seller between the Effective Date and the Closing Date less any collection costs, and Purchaser shall have the sole right after the Closing to negotiate and otherwise deal with the condemning authority in respect of such matter.  If Purchaser does not give Seller written notice of its election within the time required above, then Purchaser shall be deemed to have elected option (y) above. For the purpose of this Section 4.3, "Material Portion" means a taking of the Property which, as a result of the taking, in Seller's reasonable estimation, will result in a decrease in value of the Property equal to or exceeding $100,000.

Section 4.4    Casualty.

(a)    Casualty Notice.   If prior to Closing, the Property is damaged by fire or other casualty, Seller shall estimate the cost to repair and the time required to complete repairs and will provide Purchaser written notice of Seller's estimation (the "Casualty Notice") as soon as reasonably possible after the occurrence of the casualty.

(b)    Material.   In the event of any Material Damage, as defined herein, to or destruction of the Property or any portion thereof prior to Closing, either Seller or Purchaser may, at its option, terminate this Agreement by delivering written notice to the other on or before the expiration of five (5) days after the date Seller delivers the Casualty Notice to Purchaser (and if necessary, the Closing Date shall be extended to give the Parties the full five (5) day period to make such election and to obtain insurance settlement agreements with Seller's insurers).  Upon any such termination, the Deposit shall be returned to Purchaser and the Parties hereto shall have no further rights or obligations hereunder, other than those that by their terms survive the termination of this Agreement.  If neither Seller nor Purchaser so terminates this Agreement within said five (5) day period, then the Parties shall proceed under this Agreement and close on schedule (subject to extension of Closing as provided above), and as of Closing, Seller shall assign to Purchaser, without representation or warranty by or recourse against Seller, all of Seller's rights in and to any resulting insurance proceeds due Seller as a result of such damage or destruction and Purchaser shall assume full responsibility for all needed repairs, and Purchaser shall receive a credit at Closing for any deductible amount under such insurance policies (but the amount of the deductible plus insurance proceeds shall not exceed the lesser of (A) the cost of repair or (B) the

Purchase Price); provided, however, Seller shall retain the claim against the insurance company and the right to negotiate and settle with the insurance company regarding the claim, but Seller agrees to keep Purchaser informed as to the status of said negotiations.  For the purposes of this Section 4.4, "Material Damage" and "Materially Damaged" means damage which, in Seller's reasonable estimation, exceeds $100,000.

(c)    Immaterial.  If the Property is not Materially Damaged, then neither Purchaser nor Seller shall have the right to terminate this Agreement, and Seller shall, at its option, either (i) repair the damage before the Closing, or (ii) credit Purchaser at Closing for the reasonable cost to complete the repair (in which case Seller shall retain all insurance proceeds and Purchaser shall assume full responsibility for all needed repairs).

## ARTICLE 5.
## BANKRUPTCY COURT APPROVAL

Section 5.1   Court Approval.  Purchaser agrees and acknowledges that Seller's rights and obligations under this Agreement are subject to entry of the Sale Authorization Order authorizing Seller to sell the Property on the terms and conditions set forth in this Agreement, including any amendments and/or modifications of this Agreement free and clear of any claims of Record Owner. Notwithstanding anything in this Agreement to the contrary, in the event Seller does not obtain the Sale Authorization Order within sixty (60) days after the Effective Date, Seller shall have the right to extend the time for Bankruptcy Court approval for two (2) additional periods of thirty (30) days each.  Subject to Purchaser's obligations hereunder, including its obligation to deliver the Additional Deposit, if the Bankruptcy Court has not entered the Sale Authorization Order within the extension approval periods, either Seller or Purchaser may terminate this Agreement and the Deposit shall be returned to the Purchaser and the parties shall have no further obligation to each other except for those provisions which expressly survive termination.

Section 5.2   Effect of Order. Purchaser acknowledges that the Property is owned by Record Owner and that the Property is property of the Bankruptcy Estate and can only be sold in accordance with an order from the Bankruptcy Court authorizing such sale. Purchaser further acknowledges and agrees that Seller has not had an opportunity to fully inspect the Property or the documents relating to the Property and Seller, to the fullest extent permitted by applicable law, expressly disclaims all representations and warranties as to the condition of either the Property or documents relating to the Property.

Section 5.3   No Personal Liability.  Purchaser agrees that this Agreement and all instruments or documents executed in connection with this Agreement and

delivered by Seller are executed and delivered by Seller not personally but in the exercise of the powers conferred upon Seller as a Subchapter V trustee and pursuant to the Trustee Order.  Purchaser acknowledges and agrees that no personal liability assumed by and none shall be at any time asserted or enforceable against Seller on account of this Agreement or the documents executed in connection with this Agreement.

Section 5.4   Conflict with Court Orders.  Notwithstanding any other provision in this Agreement, Seller shall have no obligation to perform in any manner under this Agreement that is contrary to or in excess of its powers and authorities under the Trustee Order or any other order of the Bankruptcy Court or provision of the Bankruptcy Code. If there is any conflict between the provisions of this Agreement and the terms of any order of the Bankruptcy Court, including the Sale Authorization Order, the terms of the orders of such orders of the Bankruptcy Court shall control.

Section 5.5   Expenses.

(a)   Costs and expenses shall be allocated as provided in Section B-3 above.  Except as otherwise expressly provided in Section B-3 above or elsewhere in this Agreement, each Party agrees to pay its own expenses (including the fees and expenses of its own attorneys, accountants and other advisors) in connection with its due diligence activities, negotiating this Agreement and any related agreements, obtaining any required approvals, including the Sale Authorization Order and otherwise preparing for the Closing.

(b)   The Parties agree to cooperate with one another to prepare and file, or cause to be prepared and filed, with the relevant governmental authorities all transfer tax returns, affidavits and other similar instruments, if any, required in connection with the payment of the foregoing expenses. If and to the extent Purchaser receives a credit at Closing with respect to any obligation or liability of Seller, Purchaser shall indemnify, defend and hold Seller harmless from and against any further obligation or  liability with respect to same, which indemnification shall survive the Closing.

(c)   5.6   The provisions of this <u>Article 5</u> shall survive the Closing or the termination of this Agreement.

## ARTICLE 6. CLOSING

Section 6.1   Closing.

(a)   Subject to the terms and conditions of this Agreement, the Closing shall take place at the offices of Escrow Agent (or such other location as may be mutually agreed upon by Seller and Purchaser), at and as of 10:00 A.M.

(Central Time) on the Closing Date, TIME BEING OF THE ESSENCE. As used in this Agreement, the term "Closing" means the transfer and assignment of the Property to Purchaser and the performance by each Party of the obligations on its part then to be performed under and in accordance with this Agreement.

(b)    Notwithstanding any other provision herein to the contrary, there shall be no requirement that Seller and Purchaser physically attend the Closing, and all funds and documents to be delivered at the Closing may be delivered to Escrow Agent unless the parties hereto mutually agree otherwise. Purchaser and Seller hereby authorize their respective attorneys to execute and deliver to Escrow Agent any additional or supplementary instructions as may be necessary or convenient to implement the terms of this Agreement and facilitate the closing of the transactions contemplated hereby, provided that such instructions are consistent with and merely supplement this Agreement and shall not in any way modify, amend or supersede this Agreement.

Section 6.2   Closing Deliveries by Seller.  At the Closing, Seller shall deliver or cause to be delivered to Escrow Agent each of the following instruments and documents:

(a)    Deed. A trustees deed in substantially the form of Exhibit B attached hereto (the "Deed"), duly executed by Seller and acknowledged.

(b)    Bill of Sale. A quitclaim bill of sale in the form of Exhibit C attached hereto (the "Bill of Sale"), duly executed by Seller.

(c)    FIRPTA Affidavit. An affidavit, in the form of Exhibit E attached hereto (the "FIRPTA Affidavit"), stating that it is not a "foreign person" under Section 1445 of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code").

(d)    Seller's Affidavit. A Seller's affidavit in a form reasonably acceptable to Seller and the Title Company (the "Seller's Affidavit").

(e)    Tax Forms. Completed state, city and other documentary stamp, transfer or other similar tax forms (to the extent required under applicable law).

(f)    Closing Statement. A closing statement, duly executed by Seller (the "Closing Statement").

(g)    Other Documents, Etc. Such other documents or instruments as Purchaser or Title Company reasonably may request to effect the transactions contemplated in this Agreement without expense or liability to Seller.

(h)    Keys, security codes and passwords to the Property.

Section 6.3   <u>Closing Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver to Escrow Agent the following agreements, instruments and payments:

(a)     Purchase Price. The Purchase Price, payable in the manner provided for in Section 2.1 of this Agreement, and evidence satisfactory to Seller that all costs and expenses required to be paid by Purchaser pursuant to this Agreement have been paid.

(b)     Bill of Sale.  The Bill of Sale, duly executed by Purchaser.

(c)     Tax Forms. Completed state, city and any other documentary stamp, transfer or other similar tax forms (to the extent required by applicable law).

(d)     Closing Statement. A counterpart of the Closing Statement, duly executed by Purchaser.

(e)     Other Documents, Etc. Such other documents or instruments as Seller or Title Company reasonably may request to effect the transactions contemplated in this Agreement without further expense or liability to Purchaser.

# ARTICLE 7.
# CONDITIONS PRECEDENT TO CLOSING

Section 7.1   <u>Conditions Precedent to Obligation of Purchaser</u>.  The obligation of Purchaser to consummate the transactions contemplated herein shall be subject to the fulfillment on or before the Closing Date, as applicable, of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

(a)     Delivery of Documents. Seller shall have delivered all of the items required to be delivered to Purchaser pursuant to Section 6.2.

(b)     Accuracy of Representations and Warranties. Subject to the other provisions of this Agreement, including Section 2.2, the representations and warranties of Seller in this Agreement shall be true and correct in all material respects as of the Effective Date.

(c)     No Injunction. No action, suit or legal or administrative proceeding shall have been instituted by or before any agency, bureau, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign (referred to herein as "Governmental Authority"), seeking to enjoin the transactions contemplated by this Agreement, other than any such proceeding initiated by or on behalf of Purchaser or any of Purchaser's Representatives.

{00221955 2}                                        17

(d)     Title. The Title Company shall have issued or shall be prepared to issue, upon payment of the applicable premiums therefor, a title policy with respect to the Real Property, showing title to the Real Property vested in Purchaser, subject only to (i) customary, "pre-printed" exceptions, (the "Title Policy").

(e)     Transactions Not Prohibited. No statute, rule, regulation, temporary restraining order, preliminary or permanent injunction or other order issued by any Governmental Authority or other legal restraint or prohibition preventing the consummation by the Seller of the transactions contemplated by this Agreement shall be in effect or, if applicable, have been threatened by any Governmental Authority, other than any such order or other legal restraint or prohibition or threat thereof requested or otherwise obtained by or on behalf of Purchaser or any of Purchaser's Representatives.

(f)     Sales Authorization Order.  Entry of the Sale Authorization Order by the Bankruptcy Court in a form reasonably acceptable to Seller and Purchaser.

(g)     The execution of an agreement or agreements by Purchaser and Seller, prior to Closing, for a lease, license, management and/or profit-sharing structure which will facilitate the continuous operation of the restaurant for 90 days following Closing, with 2 additional 30-day options to extend, exercisable by the Purchaser. In the event that Purchaser and Seller are unable to agree on such a structure, all sums paid by the Purchaser to the Seller, including, but not limited to, the Cash Deposit and the Additional Deposit, shall be refunded to the Purchaser within 1 business day of the Purchaser's transmittal of written notice to the Seller of the termination of this Agreement on the basis that the parties are unable to agree to a structure that will facilitate the continuous operation of the restaurant for 90 days following Closing, with 2 additional 30-day options to extend, exercisable by the Purchaser.

Section 7.2   Conditions Precedent to Obligation of Seller.  The obligation of Seller to consummate the transactions contemplated herein shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Seller in its sole discretion:

(a)     Delivery of Documents. Purchaser shall have delivered all of the items required to be delivered to the Seller pursuant to Section 6.3.

(b)     Purchaser has delivered the Cash Deposit and the Additional Deposit in accordance with Section 2.3, and Seller is reasonably satisfied that Purchaser is capable of delivering, and will deliver, the balance of the Purchase Price at the Closing.

(c)      Accuracy of Representations and Warranties. The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects.

(d)      Observance of Covenants. Purchaser shall have performed and observed, in all material respects, all covenants and agreements in this Agreement to be performed and observed by Purchaser as of the Closing Date.

(e)      No Injunction. No action, suit or legal or administrative proceeding shall have been instituted by or before any court or Governmental Authority seeking to enjoin the transactions contemplated by this Agreement and intended to occur at the related Closing, other than any such proceeding initiated by or on behalf of Seller or any of its affiliates.

(f)      Transactions Not Prohibited. No statute, rule, regulation, temporary restraining order, preliminary or permanent injunction or other order issued by any Governmental Authority or other legal restraint or prohibition preventing the consummation by Purchaser of the transactions contemplated by this Agreement shall be in effect, or, if applicable, have been threatened by any Governmental Authority, other than any such order or other legal restraint or prohibition or threat thereof requested or otherwise obtained by or on behalf of Seller or any of its affiliates.

## ARTICLE 8.
## REPRESENTATIONS AND WARRANTIES

Section 8.1   <u>Representations and Warranties of Purchaser</u>.  Purchaser hereby makes the following representations and warranties:

(a)      Duly Authorized, Executed, and Delivered.  If Purchaser (whether original Purchaser or any assignee of original Purchaser) is an entity, Purchaser represents and warrants to Seller that it is duly organized and validly existing and in good standing under the laws of the state of its formation. Purchaser further represents and warrants to Seller that this Agreement and all documents executed by Purchaser that are to be delivered to Seller at Closing (i) are, or at the time of Closing will be, duly authorized, executed and delivered by Purchaser, (ii) do not, and at the time of Closing will not, violate any provision of any agreement or judicial order to which Purchaser is a party or to which Purchaser or any property or other assets owned by Purchaser is subject and (iii) constitutes (or in the case of Closing Documents, will constitute) valid and legally binding obligations of Purchaser, enforceable in accordance with their terms.

(b)      Power and Authority.  Purchaser has full and complete power and authority to enter into this Agreement and to perform its obligations hereunder.

(c)     Consents.   No consents are required to be obtained from, and no filings are required to be made with, any Governmental Authority or third party in connection with the execution and delivery of this Agreement by Purchaser or the consummation by Purchaser of the transactions contemplated hereby.

(d)     Sophisticated Investor.   Purchaser is a sophisticated investor, is represented by competent counsel, understands the assumption of risk and liability set forth in this Agreement, and is experienced in, and knowledgeable about, the ownership, management, leasing and purchase of commercial real estate, and has relied and will rely exclusively on its own consultants, advisors, counsel, employees, agents, principals and/or studies, investigations and/or inspections with respect to the Property, its tax or legal status, condition, value and potential.   Purchaser agrees that, notwithstanding the fact that it has received certain information from Seller or its agents or consultants, Purchaser has relied solely upon and will continue to rely solely upon its own analysis and will not rely on any information provided by Seller or its agents or consultants, except solely for the representations expressly made in this Agreement.

(e)     Affiliation.   Purchaser is not affiliated in any manner whatsoever with Record Owner or any of its Affiliates.

(f)     OFAC.   Purchaser is in compliance with the requirements of Executive Order No. 133224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury ("OFAC") and in any enabling legislation or other Executive Orders or regulations in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "Orders"). Further, Purchaser covenants and agrees to make its policies, procedures and practices regarding compliance with the Orders, if any, available to Seller for its review and inspection during normal business hours and upon reasonable prior notice.   Purchaser is not:

(i)     listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists");

(ii)     a person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders; or

(iii)     owned or controlled by, or acts for or on behalf of, any person or entity on the Lists or any other person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders.

If Purchaser obtains knowledge that Purchaser or any of its beneficial owners become listed on the Lists or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Purchaser shall immediately notify Seller in writing, and in such event, Seller shall have the right to terminate this Agreement without penalty or liability to Seller immediately upon delivery of written notice thereof to Purchaser, and, pursuant to Section 9.2, Escrow Agent will transfer the Deposit to Seller.  Purchaser has taken measures as required by law to assure that funds to be used to pay the Purchase Price are derived from legal sources and such measures have been undertaken in accordance with the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and all applicable laws, regulations and government guidance on compliance therewith and on the prevention and detection of money laundering violations under 18 U.S.C. §§ 1956 and 1957.  Purchaser (on behalf of itself and its successors and assigns) agrees to indemnify, defend and hold Seller (and its successors and assigns) harmless from and against any and all claims, demands, costs, expenses, liabilities, losses, damages or causes of action, including, without limitation, attorneys' fees (which attorneys' fees, without limiting the indemnity provided in this Section 8.1, Purchaser agrees to pay) arising out of any breach by Purchaser of the representations, warranties and covenants in this Section and such indemnity shall survive Closing or other termination of this Agreement.

Each of the representations and warranties of Purchaser contained herein (i) is made on the Effective Date, (ii) shall be deemed remade by Purchaser and/or its assignee(s), as applicable, and shall be true and correct as of the Closing Date, and (iii) shall survive the Closing.

Section 8.2   Representations and Warranties of Seller.  Subject to the information disclosed in the Due Diligence Materials as of the Effective Date, Seller hereby represents and warranties as follows:

(a)     Consents. Except for the Sale Authorization Order, Seller has no knowledge of any consents required to be obtained from any governmental authority or third party in connection with the execution and delivery of this Agreement by Seller or the consummation by Seller of the transactions contemplated hereby other than consents that have been obtained (or will be obtained prior to Closing).

(b)     Litigation.  As of the Effective Date, Seller has not received written notice of any litigation that is pending or threatened with respect to the Property, except (i) litigation that is not reasonably likely to have a material adverse effect on the value of the Property, (ii) litigation covered by insurance policies (subject to customary deductibles) or (iii) litigation set forth in Schedule 8.2(b).

(c)     Law Compliance.  As of the Effective Date, Seller has not received any written notice from any Governmental Authority that all or any portion of the Property are in material violation of any applicable building codes, zoning law or land use law, or any applicable local, state or federal law or regulation relating to the Property, which material violation has not been cured or remedied in accordance with applicable law prior to the Effective Date or which will not be cured at or prior to Closing.

(d)     Duly Authorized, Executed, and Delivered.   Subject to the terms of the Trustee Order and any order of the Bankruptcy Court, this Agreement and all documents executed by Seller that are to be delivered to Purchaser before or at Closing (i) are, or at the Closing will be, duly authorized, executed and delivered by Seller, (ii) do not, or at the Closing will not, violate any provision of any agreement or judicial order to which Seller is a party or to which Seller or any Property owned by Seller is subject, and (iii) constitute (or in the case of Closing Documents, will constitute) valid and legally binding obligations of Seller, enforceable in accordance with their terms subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights.

(e)     Power and Authority.   Subject to the terms of the Trustee Order and any order of the Bankruptcy Court, Seller has full and complete power and authority to enter into this Agreement and, subject to obtaining any consents or waivers required to be obtained prior to Closing, to perform Seller's obligations hereunder and under all documents executed by Seller that are to be delivered to Purchaser before or at Closing. The individual(s) executing this Agreement and the instruments referenced herein on behalf of Seller have the legal power, right and actual authority to bind the Bankruptcy Estate to the terms hereof and thereof.

Section 8.3   Limitation on Liability and Survivability of Seller's Representations and Warranties.

(a)     Notwithstanding any provision to the contrary herein or in any document or instrument (including any deed or assignment) executed by Seller and delivered to Purchaser at or in connection with the Closing (collectively, "Closing Documents"), the representations and warranties of Seller contained herein or in any Closing Document shall not survive the Closing but shall terminate and be of no further force or effect upon the consummation of the Closing, and Seller shall not have (and Seller is exculpated and released from any) liability whatsoever with respect to any suits, actions, proceedings, investigations, demands, claims, liabilities, fines, penalties, liens, judgments, losses, injuries, damages, expenses or costs, including attorneys' and experts' fees and costs of investigation and remediation costs (collectively "Representation and Warranty Claims") under, and Purchaser shall be forever barred from making or bringing any Representation and

Warranty Claims with respect to, any of the representations and warranties contained in this Agreement or in any Closing Document.  Purchaser acknowledges and agrees that it will have the opportunity to independently verify the accuracy of Seller's representations and warranties during the Due Diligence Period, and if Purchaser elects to close under this Agreement it shall do so without any reliance upon, or the right to rely upon, any of Seller's representations and warranties, all of which are waived effective as of the Closing.

**ARTICLE 9.**
**TERMINATION AND DEFAULT**

Section 9.1   <u>Termination by Purchaser</u>.  Except as otherwise provided in <u>Section 9.3, Section 7.1, Section 4.3,  or Section 4.4,</u> if this Agreement is terminated by Purchaser pursuant to its rights to terminate as expressly provided elsewhere in this Agreement then the Parties agree that the Escrow Agent will promptly pay the Deposit to Seller as consideration for this Agreement, and Purchaser and Seller shall have no further rights, obligations or liabilities hereunder, other than those which by their terms survive termination of this Agreement.

Section 9.2   Purchaser's Default; Liquidated Damages Deposit.

(a)   IF PURCHASER FAILS TO PERFORM ITS OBLIGATIONS PURSUANT TO THIS AGREEMENT AT OR PRIOR TO CLOSING (FOR ANY REASON EXCEPT FAILURE BY SELLER TO PERFORM HEREUNDER), OR IF PRIOR TO CLOSING ANY ONE OR MORE OF PURCHASER'S REPRESENTATIONS OR WARRANTIES ARE BREACHED IN ANY MATERIAL RESPECT, SELLER SHALL BE ENTITLED TO TERMINATE THIS AGREEMENT (EXCEPT THE PROVISIONS HEREOF AND THEREOF WHICH EXPRESSLY SURVIVE TERMINATION) AND, IN ADDITION TO ANY OTHER REMEDIES, INCLUDING, WITHOUT LIMITATION, A SUIT FOR DAMAGES.

(b)   The provisions of this Section 9.2 shall survive any termination of this Agreement.

Section 9.3   <u>Seller's Default</u>.  If, on the Closing Date, Seller is in material default of this Agreement (for the avoidance of doubt, the failure of Seller to satisfy a condition to Purchaser's obligation to proceed to Closing shall not be deemed a default or material default hereunder), Purchaser, as its sole and exclusive remedy, shall have the right to terminate this Agreement by giving Seller written notice thereof, whereupon Escrow Agent shall return the Deposit to Purchaser. The provisions of this <u>Section 9.3</u> shall survive any termination of this Agreement. PURCHASER ACKNOWLEDGES AND AGREES THAT PURCHASER SHALL NOT HAVE ANY RIGHT TO SEEK SPECIFIC PERFORMANCE OF THIS AGREEMENT AND EXPRESSLY WAIVES ANY AND ALL RIGHTS ARISING

UNDER APPLICABLE LAWTO SEEK SPECIFIC PERFORMANCE OF SELLER'S OBLIGATION UNDER THIS AGREEMENT.

## ARTICLE 10. MISCELLANEOUS

Section 10.1 <u>Broker</u>. Seller and Purchaser expressly acknowledge that Broker has acted as Seller's exclusive agent with respect to the transaction contemplated herein and with respect to this Agreement, and that Seller shall pay a real estate brokerage commission to Broker pursuant to a separate agreement between Seller and Broker. Purchaser has been represented by @Properties as its broker with respect to this transaction, and the parties agree that @Properties shall be entitled to a two percent (2%) broker's fee in cash, at closing. Each of Seller and Purchaser represents and warrants to the other that, except as set forth herein, it has not dealt with any other broker in connection with this transaction and each agrees to hold harmless the other and indemnify the other from and against any and all damages, costs or expenses (including, but not limited to, reasonable attorneys' fees and disbursements) suffered by the indemnified Party as a result of acts of the indemnifying Party that would constitute a breach of its representation and warranty in this Section. The provisions of this <u>Section 10.1</u> shall survive the Closing or termination of this Agreement.

Section 10.2 Further Assurances. Seller and Purchaser agrees at any time and from time to time after the Closing, to execute, acknowledge, where appropriate, and deliver such further instruments and documents and to take such other action as Seller or Purchaser (or its affiliates) may reasonably request in order to carry out the intent and purpose of this Agreement. The provisions of this Section 10.2 shall survive the Closing.

Section 10.3 Notices. Any notices required or permitted to be given hereunder shall be given in writing and shall be delivered (a) in person, (b) by a commercial overnight courier that guarantees next day delivery and provides a receipt, or (c) by certified mail return receipt requested, postage prepaid, and shall be served on the parties at the addresses set forth in Section B-2 above. Any of the Parties may change its address for the receipt of notices, demands, consents, requests and other communications by giving written notice to the other Parties in the manner provided for above. Any notice shall be effective only upon receipt (or refusal by the intended recipient to accept delivery).

Section 10.4 Assignment. Purchaser shall not have the right to assign, transfer, convey and/or otherwise sell (or enter into any agreement to do the same), directly or indirectly, any interest it may have in or under this Agreement without first having obtained the written consent of Seller, which consent may be withheld in Seller's sole and absolute discretion. The foregoing notwithstanding, Purchaser may assign its rights under this Agreement without Seller's consent only upon the following conditions: (i) the assignee of Purchaser must be an affiliate of Purchaser

or an entity controlling, controlled by, or under common control with Purchaser or a special purpose entity created by Purchaser and in which Purchaser has an ownership interest, (ii) all of the Deposit must have been delivered in accordance herewith, (iii) the assignee of Purchaser shall assume all obligations of Purchaser hereunder, but Purchaser shall remain primarily liable for the performance of Purchaser's obligations to the extent accruing prior to such assignment, (iv) a copy of the fully executed written assignment and assumption agreement shall be delivered to Seller at least five (5) days prior to Closing and (v) the Bankruptcy Court has approved such assignment.  Upon any such assignment and/or conveyance of the Property or any portion thereof to the assignee of Purchaser, all disclaimers, waivers, releases, indemnities and other protections afforded Seller by the terms of this Agreement, and all covenants, representations, warranties and obligations of Purchaser hereunder, shall apply to and be binding on said assignee.

Section 10.5 Third Party Beneficiaries.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, but shall not inure to the benefit of, or be enforceable by, the Title Company, Escrow Agent or any other Person.

Section 10.6 Waiver.  Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the Party against whom the enforcement of the change, waiver, discharge or termination is sought or, in the case of a default waiver, by the non-defaulting Party or Parties.

Section 10.7 Incorporation of Recitals and Schedules.  The Recitals to this Agreement and the Exhibits and Schedules attached hereto are hereby incorporated by reference into the body of this Agreement and made a part hereof.

Section 10.8 Confidentiality.

(a)     Purchaser acknowledges the confidential and proprietary nature of the Due Diligence Materials and information provided to Purchaser.  Purchaser agrees that all information obtained by Purchaser (i) shall be kept confidential by the Purchaser; (ii) shall not be used for any reason or purpose other than to evaluate and/or consummate the transaction contemplated herein; and (iii) shall not be disclosed by the Purchaser to any person other than Purchaser's attorney(s), lender(s), accountant(s), property manager(s), consultant(s) or advisor(s) for the purpose of evaluating the transaction contemplated herein.   Seller shall be entitled, in addition to all other remedies available to it at law or in equity, to seek injunctive and other equitable relief to prevent a breach of the confidentiality provisions of this Agreement and to secure the enforcement of confidential provisions of this this Agreement.  If any legal action or other proceeding is brought for the enforcement or interpretation of any of the rights or provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorney fees and all other

costs and expenses incurred in that action or proceeding, in addition to any other relief to which it may be entitled.  This Section 10.8 shall survive the Closing or any termination of this Agreement.

(b)     After Closing, Seller or Purchaser may issue a press release with respect to this Agreement and the transactions contemplated hereby.

Section 10.9  Merger.  All understandings and agreements heretofore had between the Parties hereto are merged in this Agreement and the instruments and documents referred to herein, which fully and completely express their agreements with respect to the transactions contemplated herein, and supersede all prior agreements, written or oral, with respect thereto.

Section 10.10      Governing Law.  WITH RESPECT TO THE PROPERTY AND THIS AGREEMENT, THIS AGREEMENT AND THE TRANSACTIONS IT CONTEMPLATES ARE INTENDED TO BE PERFORMED IN THE STATE OF ILLINOIS AND THE LAWS OF ILLINOIS (EXCLUSIVE OF CHOICE OF LAW PRINCIPLES THAT WOULD APPLY THE LAW OF A DIFFERENT STATE) AND SHALL GOVERN ALL ASPECTS OF THIS AGREEMENT AND THE TRANSACTIONS THIS AGREEMENT CONTEMPLATES, EXCEPT TO THE EXTENT ILLINOIS LAW AND THE PROVISIONS OF THE BANKRUPTCY CODE ARE INCONSISTENT OR CONFLICTING, IN WHICH CASE THE BANKRUPTCY CODE PROVISIONS SHALL APPLY AND BE CONTROLLING.

Section 10.11      Venue for Disputes..  The Parties agree that the Bankruptcy Court shall be the exclusive venue for any suit, action or proceeding to enforce or implement any term or condition of this Agreement or to hear, consider or adjudicate any issues regarding the marketing or sale of the Property or any other transaction related thereto (an "Action"), including, but not limited to, any Action related to any claims or disputes regarding this Agreement or the transaction contemplated by this Agreement or arising as a result of any claimed breach of this Agreement; provided, however, if the Bankruptcy Court is unable or unwilling to exercise such jurisdiction, the state or federal courts, as applicable, in Cook County, Illinois shall be the exclusive venue for an Action.  Each of the Parties consents and submits to the jurisdiction of any state or federal court in Cook County, Illinois, and waives any objection to the venue of any such Action so long as it in an applicable court in Cook County. The Parties recognize that courts other than the Bankruptcy Court or the state or federal courts in Cook County may also have jurisdiction over an Action, and in the event any Party institutes an Action in a jurisdiction outside Cook County, the Party instituting such proceeding shall indemnify any other Party hereto for any losses and expenses that may result from the breach of the foregoing covenant to institute such proceeding only in a state or federal court in Cook County, including without limitation any additional expenses incurred as a result of litigating in another jurisdiction, such as reasonable fees and expenses of local

counsel and travel and lodging expenses for parties, witnesses, experts and support personnel. The provisions of this <u>Section 10.11</u> shall survive the Closing and any termination of this Agreement.

Section 10.12      Captions.  The captions and Article headings included in this Agreement and the table of contents are for convenience only, do not constitute part of this Agreement and shall not be considered or referred to in interpreting the provisions of this Agreement.

Section 10.13      Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument. The submission of a signature page transmitted by facsimile (or similar electronic transmission facility, including PDF via email) shall be considered as an "original" signature page for purposes of this Agreement.

Section 10.14      Severability.  If any provision hereof is held invalid or not enforceable to its fullest extent, such provision shall be enforced to the extent permitted by law, and the validity of the remaining provisions hereof shall not be affected thereby.

Section 10.15      Prior Negotiations; Construction.  No negotiations concerning or modifications made to prior drafts of this Agreement shall be construed in any manner to limit, reduce or impair the rights, remedies, duties and obligations of the Parties under this Agreement or to restrict or expand the meaning of any of the provisions of this Agreement or to construe any of the provisions of this Agreement in any Party's favor. The Parties acknowledge that each Party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement or any amendment, Schedule or Exhibit hereto.

Section 10.16      Litigation Expenses.  In the event that either Seller or Purchaser is required to employ an attorney because any litigation between the Parties arises out of this Agreement, the non-prevailing Party shall pay the prevailing Party all reasonable fees and expenses, including attorneys' fees and expenses, incurred in connection with such litigation.

Section 10.17      WAIVER OF TRIAL BY JURY.  SELLER AND PURCHASER HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM FILED BY THE SELLER OR PURCHASER, WHETHER IN CONTRACT, TORT OR OTHERWISE, WHICH RIGHT OR CLAIM RELATES DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, ANY MATTER RELATED HERETO, OR ANY ACTS OR OMISSIONS IN CONNECTION WITH THIS

AGREEMENT. THIS WAIVER HAS BEEN AGREED TO AFTER CONSULTATION
WITH LEGAL COUNSEL SELECTED BY PURCHASER AND SELLER.

Section 10.18      Business Day Convention; Time of Essence.  If the date on
which, or time period by which, any right, option, election or other matter provided
under this Agreement must be exercised, or by which any act required hereunder
must be performed, or by which the Closing shall occur, falls or expires on a day
that is not a Business Day, then such date or time period shall be automatically
deferred or extended until the close of business on the next Business Day. The
Parties agree that time is of the essence with respect to obligations of the Parties
set forth in this Agreement including but not limited to each of the dates and time
periods provided for in this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day
and year first above written.

SELLER:

Cite, LLC

By:    Robert Handler, not in any capacity,
including any individual capacity, other than
in the capacity as the Subchapter V Trustee
for the Bankruptcy Estate of Cite, LLC

Name:
Its:    _____

PURCHASER:
Lakeshore Commercial Properties LLC

By:    _____
Name: Al Lotfi
Its:    Manager

## EXHIBITS AND SCHEDULES

**EXHIBITS**

EXHIBIT A            Legal Description of Real Property

EXHIBIT B            Form of Trustee's Deed

EXHIBIT C            Form of Bill of Sale

EXHIBIT D            Form of FIRPTA Certificate


**SCHEDULES**

SCHEDULE 8.2(d) Pending Litigation

# EXHIBIT A
## Legal Description of Real Property

## EXHIBIT B
## Form of TRUSTEES Deed

This document was prepared by:

Upon recording return to:

## TRUSTEE'S  DEED

Robert Handler, not in his individual, personal or other capacity, other than in his capacity as ("Grantor"), Subchapter V Trustee with expanded powers for Cite LLC, pursuant to an order of the United States Bankruptcy Court of the Northern District of Illinois, Eastern Division, case number 21-13730 ,whose address is c/o Commercial Recovery Associates, LLC, 205 W Wacker Drive, Suite 918, Chicago, IL 60606, in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does by these presents SELL AND CONVEY unto Lakeshore Commercial Properties LLC  ("Grantee"), whose address is 505 N. Lake Shore Drive, Chicago, IL 60611 its successors and assigns, the lots, tracts or parcels of land lying, being and situated in the County of Cook, in the State of Illinois, the common address of which is 505 N. Lake Shore Drive, Chicago, IL 60611, which is legally described on **Exhibit A** attached hereto and incorporated herein by reference, subject to the matters set forth on **Exhibit B** attached hereto and incorporated herein by reference (collectively, the "Permitted Exceptions") pursuant to an Order Authorizing Sale entered by the United States Bankruptcy Court for the Northern District of Illinois Eastern Division, a copy of which is attached ("Sale Authorization Order").

TO HAVE AND TO HOLD the premises aforesaid with all and singular the rights, privileges, appurtenances and immunities thereto belonging or in any wise appertaining unto said Grantee and its successors and assigns forever, subject to the

{00221955 2}                              32

Permitted Exceptions, said Grantor hereby covenanting that the premises are free and clear from any encumbrance done or suffered by Grantor; and that Grantor will warrant and defend the title to said premises unto the said Grantee and its successors and assigns forever, against the lawful claims and demands of all persons claiming by, under or through Grantor but not otherwise pursuant to the Sale Authorization Order.

IN WITNESS WHEREOF, this Trustee's Deed has been executed by Grantor as of the acknowledgement date below to be effective as of the August 1, 2022.

GRANTOR:

By: _____
Name: _____ .
Its: _____

THE STATE OF _____ §
                                                    §
COUNTY OF  _____ §

The   foregoing   instrument   was   acknowledged   before   me   this   _____   day   of
_____, 2022 by _____, the _____
of _____, a[n] _____, on behalf of said
_____.

_____
Notary Public

[NOTARIAL STAMP OR SEAL]

Send tax bills to:

_____

_____

_____

## EXHIBIT C
## Form of QUIT CLAIM Bill of Sale

THIS QUIT CLAIM BILL OF SALE (this "Bill of Sale"), dated as of August 1, 2022 (the "Effective Date"), by and between (i) _____, a[n] _____ ("Seller"), and (ii) _____, a [_____] (the "Purchaser"), (collectively, the "Parties" and individually, "Party").

R E C I T A L S:

WHEREAS, the Seller is the owner of the property located in the City of _____, _____, and more particularly described in **Exhibit A** attached hereto (the "Property").

WHEREAS, pursuant to that certain Purchase and Sale Agreement, dated as of [_____, 20___] (the "Purchase Agreement"), by and among the Seller and the Purchaser, the Seller has agreed to sell, transfer, assign and deliver all of its right, title and interest in and to the Personal Property, all as more specifically identified below.

NOW, THEREFORE, in consideration of the premises, covenants and agreements contained herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby agree as follows:

A G R E E M E N T:

1.  Seller hereby sells, grants, conveys, transfers, sets over and delivers to Purchaser pursuant to an Order Confirming Sale of the United States Bankruptcy Court of the Northern District of Illinois Eastern Division, a copy of which is attached ("Sale Authorization Order"), Seller's right, title and interest in and to:

    All (i) items of tangible personal property consisting of all furniture, fixtures, equipment, machinery, and other tangible personal property located at the Real Property, including all inventories of food and beverage in opened and unopened containers and all in-use or stock of linens, china, glassware, silver, uniforms, towels, paper goods, stationery, soaps, cleaning supplies and the like with respect to the restaurant on hand as of the Closing Date (the "Inventory"), and  any warranties and guaranties relating to the Personal Property.

2.  Purchaser hereby accepts the Personal Property from the Seller "AS IS, WHERE IS AND WITH ALL FAULTS", and without any representation or warranty, express or implied, by the Seller or any third person regarding the condition, quantity, design, merchantability, fitness or quality thereof.

3.  The agreements, covenants and terms thereof shall be binding upon and inure to the benefit of the successors and assigns of the Parties hereto.

4.      Capitalized terms not otherwise defined in this Bill of Sale shall have the meaning ascribed to such terms in the Purchase Agreement.

5.      This Bill of Sale shall be governed by, and interpreted in accordance with, the laws of the State of Illinois.

6.      This Bill of Sale may be executed in one or several counterparts, and each counterpart so executed shall be deemed to be an original for all purposes hereunder.

IN WITNESS WHEREOF, the Parties hereto have caused this Bill of Sale to be duly executed as of the day and year first above written.

SELLER:


By:      _____
Name: _____
Its:      _____

PURCHASER:


By:      _____
Name: _____
Its:      _____

# EXHIBIT D

# EXHIBIT E
## Form of FIRPTA Certificate

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a United States real property interest by the undersigned ("Seller"), Seller hereby certifies:

1.      Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code and the Income Tax Regulations);

2.      Seller's U.S. employer identification number is [_____]; and

3.      Seller's office address is:

_____

_____

_____

_____

Seller understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Seller.

By: _____

Name: _____.

Its: _____

## SCHEDULE 8.2(d)
## <u>Pending (or stayed) Litigation</u>

1.      In re CITE, LLC, bankruptcy case pending in the United States Bankruptcy Court for the Northern District of Illinois.

2.      *Lake Point Tower Condominium Association v. Cite, LLC, et al.* 2020 CH 01706

3.      *A. Abboud-Vs-Cite, Llc, Evangeline Gouletas, Point Lake, Equities Skyline, Skyline On Brickell, Ltd.,At Skyline,* 2020L050150.

4.      *Republic Bank Of Chicago, Anselno Linber Associatio,* Consolidate With Case, 20ch1705 3/11/20-Vs-Cite, Llc, Evangeline Gouletas, 2019 CH 11609.